In the Matter of LAKE HOPATCONG WATER CORPORATION, Bankrupt.

Bankruptcy No. 78–01513.

United States Bankruptcy Court, D. New Jersey.

Nov. 2, 1981.

---

4. One wonders whether, under the new standard, a drunken driver could be regarded as having a subjective intent to do harm.

Nolan, Bell & Moore, by Daniel J. Moore, Newark, N. J., Trustee, for Trustee.

Robert H. Jaffe, by Howard G. Schlesinger, Springfield, N. J., for claimants intervenors Rockville Capital Corp., Global International and Robert H. Jaffe.

William W. Robertson, U. S. Atty., by Lorraine Gerson, Asst. U. S. Atty., Newark, N. J., for The Small Business Administration.

John B. Landers, Hackensack, N. J., for First National State Bank of Long Island.

James R. Zazzali, Atty. Gen., by Heikki Leesment, Newark, N. J., Deputy Atty. Gen., for Public Utilities Commission.

## OPINION

VINCENT J. COMMISA, Bankruptcy Judge.

This matter is before the Court on a motion for summary judgment by the trustee in bankruptcy of Lake Hopatcong Water Corporation, the bankrupt herein, and the cross-motion of the United States Small Business Administration (SBA) to dismiss Counts I and II of the trustee's complaint or in the alternative for summary judgment.

On June 22, 1978 the Lake Hopatcong Water Corporation (LHWC) filed a petition for arrangement under Chapter XI of the Bankruptcy Act. On the same day an order appointing Daniel J. Moore, Esq., receiver of the estate was entered. Thereafter on April 23, 1979 LHWC was adjudicated a bankrupt and on July 24, 1979 Moore was appointed trustee of the bankrupt estate and duly qualified as same.

The bankrupt LHWC, a public utility company of the State of New Jersey, operated a water company which supplied water to residents of the Lake Hopatcong, New Jersey area and was subject to the control and supervision of the Public Utility Commission (PUC). LHWC had been advised by the PUC that they were required to make certain improvements to the water system they maintained. In order to finance the improvements and to retire certain short term loans, the LHWC, decided to borrow monies to enable it to comply with the requirements of the Board of Public Utility Commissioners (BPUC). The authorization of the BPUC was required by the provisions of N.J.S.A. 48:3–9 since the loan to be made was to be payable more than twelve (12) months after the date of issuance.

LHWC then proceeded to negotiate the terms of a loan agreement with the Bank and the SBA which was to guarantee 87.5% of the $400,000.00 loan. Both the Bank and SBA demanded certain guarantees, terms and requirements of security as part of the commitment to making the loan. Among them were the following:

"2. The loan will be secured by the First Security Interest (under the New Jersey State Uniform Commercial Code) in all machinery, equipment, furniture, fixtures now owned and hereafter acquired and to be acquired with loan proceeds.

3. The loan will be further secured by First Security Interest (under the New Jersey State Uniform Commercial Code) in all accounts receivable and inventory now owned and hereafter created.

4. In addition, the loan will also be secured by a pledge and assignment of all of the corporate stock of Lake Hopatcong Water Corporation if permitted by the Board.

6. It is required that the Bank be furnished with a mortgage on the land to be acquired with the loan proceeds, if land is purchased for the improvements.

10. In no event, will any disbursements be made until such time as the Public Utilities Commission of the State of New Jersey has granted an interim increased rate adjustment to Lake Hopatcong Water Corporation of at least 66.63%."

The written commitment containing the above provisions was issued on September 28, 1973.

Thereafter on October 15, 1973 the LHWC filed a petition with the Board of Public Utility Commissioners (BPUC) seeking authority to enter into a long term financing transaction whereby they would borrow $400,000.00 from the Bank with the SBA guaranteeing said loan. The term of the loan was for seven years and the interest rate on same was eleven (11%) per cent per annum. The petition contained the entire list of guarantees, terms and requirements of security as demanded by both the Bank and the SBA.

However on October 18, 1973 LHWC wrote to the Bank requesting that the requirement of a mortgage on the land to be acquired be eliminated. The Bank agreed to this request but it must be noted that neither the Bank, SBA nor LHWC advised the BPUC that a change had been made in the terms and conditions of the loan.

Unaware of the change in terms of security for the loan, the BPUC staff proceeded to process the petition. During the course of its processing the petition, they raised questions regarding paragraph 4 which dealt with the pledge of stock, paragraph 5 which concerned itself with the hypothecation of funds due LHWC from its parent corporation and paragraph 6 which required a mortgage on lands to be acquired with proceeds of the loan.

Thereafter on November 21, 1973, the BPUC issued its order which provided in pertinent part as follows:

"the Board, being satisfied that the issuance of the promissory note is to be made in accordance with law, is in the public interest and approving the purposes thereof;

HEREBY AUTHORIZES Lake Hopatcong Water Corporation to execute a mortgage and issue a promissory note to the First National Bank of Glen Head, Glen Head, New York in the amount of $400,000.00 for a period of seven (7) years with interest at the rate of 11% per annum."

The order further provided that:

"The proceeds from the note in the amount of $400,000.00 are to be used to repay outstanding short term notes in the total amount of $150,000.00 and the balance of $250,000.00 to pay for certain improvements to the petitioner's water plant system as directed by the Board in Docket No. 718–548 and 725–434." and

". . . the loan [was] to be secured by a mortgage in the petitioner's utility plant now owned and hereafter acquired from the proceeds of the loan."

As to the petitioner and Bank's request for authorization to pledge and assign the corporate stock of the petitioner, the order stated that:

"In addition to the above-mentioned mortgage and guarantees as security for the loan, the bank is also requiring that subject to Board approval, all the stock of petitioner be pledged and assigned to it. In this regard, the Board's authorization for the issuance of the note shall not be construed as approval of a transfer of stock on the books and records of petitioner (N.J.S.A. 48:3–10). Nor is the authority herein granted to be considered as approval of the pledge or assignment of the stock of petitioner. In the event of default on the loan and it becomes necessary for the bank to invoke the default provision of the loan, a determination as to whether such transfer is in the public interest will be made by the Board at that time."

The BPUC order provided that the authorization granted was subject to the following provisions.

"1. Upon completion of the transaction herein authorized, petitioner shall submit forthwith a copy of the aforesaid note and mortgage as executed.

2. Petitioner shall file monthly reports as to its construction program, with a detailed breakdown of the total program by project, estimated cost, and a timetable as to when the construction is to be made; as well as the amount expended as of the date of the report, the amount to be expended and estimated date of com-

pletion and placement into service, which must be substantially accomplished prior to the 1974 summer season.

3. The committee which is to be formed as provided for in petitioner's recent rate proceeding Docket No. 738–666 will oversee the expenditure of the funds authorized to be issued herein and will determine the priorities of the improvements to be made with the funds.

4. This Order shall not affect, nor in any way limit the exercise of the authority of this Board, or of the State in any future petition, or in any proceeding with respect to rates, financing, accounting, capitalization, depreciation, or any other matter affecting the petitioner.

5. The authority herein granted shall become null and void and of no effect with respect to any portion not exercised by June 30, 1974."

Thereafter on November 28, 1973 the LHWC executed a promissory note in the sum of $400,000.00 to the order of the Bank but did not enter into a mortgage as required by the BPUC order of November 21, 1973. It proceeded to enter into a security agreement, dated November 28, 1973, wherein LHWC granted the Bank a security interest in its accounts receivable and contract rights, together with all machinery, equipment, fixtures and furniture now owned and thereafter acquired by LHWC. Rockville Capital Corp., a creditor of LHWC, which then held a security interest in some of the items secured by the agreement also executed the security agreement. Conforming with the provisions of the New Jersey Uniform Commercial Code, financing statements regarding the transaction were filed with the office of the New Jersey Secretary of State and with the County Clerk of Sussex County, New Jersey.

There is no dispute that no mortgage was ever executed and filed with the BPUC but the note and security agreement were filed with the BPUC.

On June 27, 1978, five (5) days after the Chapter XI petition was filed, the Bank assigned its interest on the LHWC $400,-000.00 note to the SBA and thereafter on February 16, 1979, the Bank assigned its interest in the LHWC security agreement to the SBA.

On August 1, 1980 the trustee in bankruptcy filed a complaint directed to the Bank and the SBA wherein it sought a judgment declaring the Bank's and SBA's security interest in the LHWC assets invalid and unenforceable.

The instant summary judgment is properly before the Court as there is no dispute as to any material fact.

The trustee's contention in this summary judgment motion is that the Bank and or SBA have no security interest in the assets of LHWC as the security agreement of November 28, 1973 is invalid as it was not authorized by the BPUC order of November 21, 1973.

In the cross-motion filed, the SBA moves to dismiss the trustee's complaint on the grounds that it fails to state a claim, or in the alternative for summary judgment sustaining the status of the SBA claim as a secured claim because (1) the SBA claim is a claim of the United States and is not subject to any state regulatory regulation and procedures such as N.J.S.A. 48:3–7 and N.J.S.A. 48:3–9; (2) the security interest underlying the SBA claim was, in substance, authorized by the BPUC in its November 21, 1973 Order; (3) the regulatory statutes and proceedings do not create a private cause of action; and the trustee lacks standing to assert regulatory causes of action and (4) is further estopped by the acts of the LHWC, the bankrupt.

In contending that the trustee lacks standing to invoke either the New Jersey regulatory statutes or the BPUC order, the SBA contends that he fails to qualify as a proper plaintiff as neither the trustee or the interests he represents is within the class of persons protected by the regulatory process and therefore the requisite injury cannot be demonstrated. Bankruptcy Rule 610 provides that:

"the trustee or receiver *may, with or without court approval,* prosecute or enter his appearance and defend any pending action or proceeding by or against the bankrupt, or *commence and prosecute any action or proceeding in behalf of the estate, before any tribunal."* (emphasis added)

Bankruptcy Rule 11–57 succinctly states that "Bankruptcy Rule 610 applies to Chapter XI cases."

■ It is clear then that a trustee in bankruptcy is empowered to file an adversary proceeding in this court or any other court to determine whether certain transfers shall be voided or preserved for the benefit of the bankrupt estate. *See Schwartz v. Moran,* 406 F.Supp. 445 (D.Del. 1976).

In asserting the doctrine of estoppel, the SBA contends that bankrupts' misconduct, its failure to comply with the order of the BPUC, prevents the trustee from relying on this same misconduct to set aside the interests of the SBA.

In commenting on a bankruptcy trustee's duty to collect assets for the benefit of the estate, it is noted in 2A Collier on Bankruptcy (14th Ed. 1978) § 47.04 on page 1744.5 that:

"[I]t is the trustee's duty, representing both the bankrupt and his creditors, to realize from the estate all that is possible for distribution among creditors and to this end he may assert claims and collect assets even though, in many cases, the bankrupt would be estopped."

*See also Kindom Uranium Corporation v. Vance,* 269 F.2d 104, 106 (10th Cir. 1959) where the Court stated that a trustee under Section 70(a) of the Bankruptcy Act takes title to all of the property of the bankrupt "subject to all valid claims, liens and equities enforceable against the bankrupt except in cases where there has been a conveyance or encumbrance which is void or voidable as to the trustee by some positive provision of the Bankruptcy Act."

■ It is noted that the rights of an assignee can rise no higher than those of his assignor *Abeles v. Adams Engineering Co., Inc.,* 64 N.J.Super. 167, 187, 165 A.2d 555 (App.Div.1960) modified 35 N.J. 411 (1960); *United States v. American National Bank & Trust Co. of Chicago,* 443 F.Supp. 167, 174 (D.C.Ill.1977); *Caribbean SS. Co., S.A. v. Sonmez Denizcilik Ve Ticaret,* 598 F.2d 1264, 1266 (2nd Cir. 1979). It is clear that the assignee of a claim takes it with whatever rights and limitations the claim possessed while it was in the hands of the assignor. As noted earlier—the petition in bankruptcy was filed on June 22, 1978 and on June 27, 1978 the Bank assigned its interest in the LHWC note to the SBA. Thereafter on February 16, 1979 the Bank assigned its interest in the security agreement to the SBA.

The New Jersey statute under consideration here is N.J.S.A. 48:3–7 which provides in pertinent part as follows:

"No public utility shall, without the approval of the board, sell, lease, mortgage or otherwise dispose of or encumber its property, franchise, privileges or rights, or any part thereof, or merge or consolidate its property, franchises, privileges or rights, or any part thereof, with that of any public utility.

Every sale, mortgage, lease, disposition, encumbrances, merger or consolidation made in violation of this section shall be void."

New Jersey 48:3–9 provides in pertinent part as follows:

"No public utility shall, unless it shall have first obtained authority from the board to so do:

(a) Issue any stocks, or any bonds, notes or any other evidence of indebtedness payable more than 12 months after the date or dates thereof, or extend or renew any bond, note or any other evidence of indebtedness so that extension or renewal thereof shall be payable later than 12 months after the date of the original instrument, or . . .

the board shall approve any such proposed issue, with or without hearing at its discretion, when satisfied that such issue is to be made in accordance with law and

the purpose thereof is approved by the board ..."

It is readily apparent that the Board of Public Utility Commissioners has been vested with the broad powers among which is the power to pass upon and approve of indebtedness payable more than 12 months from the date they were incurred. *See Township of Deptford v. Woodbury Terrace Sewerage Corp.*, 54 N.J. 418, 424, 255 A.2d 737 (1969); *In re Public Service Electric and Gas Co.*, 35 N.J. 358, 371, 173 A.2d 233 (1961).

The SBA contends that the claim of the United States as a secured creditor is derived from federal law and is not barred or subject to state regulatory statutes or proceedings.

■ It relies upon the Clearfield Trust doctrine which was established in the case of *Clearfield Trust Co. v. United States*, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943). This doctrine holds that in the absence of an applicable Act of Congress, the federal courts will fashion a federal rule of law to govern in cases affecting the priority or validity of a federal lien which arises out of a federal nationwide lending program. The doctrine has been invoked in cases involving federal liens arising from SBA and FHA loan programs and under the circumstances of a particular case where it is evident that there exists a definite need for a uniform federal rule of law to implement and achieve the purposes of the loan program. On such occasions where the doctrine has been invoked, the courts have found that the vagaries of state law have frustrated the objectives and purposes of the federal loan program and to protect the federal interest which is not only to loan monies but to collect same, the federal rule of decision has evolved.

However in fashioning the federal rule of law to be applied in a particular case, the federal courts, in appropriate circumstances and where there is no overriding need for uniformity, have incorporated state law into the federal rule of decision. *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728, 99 S.Ct. 1448, 1458, 59 L.Ed.2d 711

(1979); *United States v. Yazell*, 382 U.S. 341, 86 S.Ct. 500, 15 L.Ed.2d 404 (1966).

In the *Kimbell* case, *supra*, the Supreme Court of the United States held that a uniform federal rule of absolute priority favoring the SBA was unnecessary, and incorporated the provisions of a state uniform commercial code into the federal rule of decision as it found that the state law furnished convenient solutions in no way hindering the administration of the SBA program. It noted that the SBA, by its own regulations, is required to follow state law in its commercial lending practices and that to reject state law in determining the validity or priority of liens would wreak havoc on the commercial community.

In the matter of *United States v. Yazell*, *supra*, the Supreme Court rejected the claim of the SBA which was based upon a contention that there was a need for a national uniform rule. At issue was the right of coverture as established under state law. The Court noted that even though various states dealt with coverture in different ways, the Court would not disregard and override state laws which dealt with intensely local interests such as coverture and homestead exemptions.

Most significantly to the matter presently before the Court is the statement of the Supreme Court in *United States v. Yazell*, *supra*, which provides as follows:

"The issue is whether the Federal Government may voluntarily and deliberately make a negotiated contract with knowledge of the limited capacity and liability of the persons with whom it contracts, and thereafter insist, in disregard of such limitation, upon collecting (a) despite state law to the contrary relating to family property rights and liabilities, and (b) in the absence of federal statute, regulation or even any contract provision indicating that the state law would be disregarded" p. 350–351, 86 S.Ct. p. 505–06.

The Court proceeded to state that

"Clearly, in the case of these SBA loans there is no 'federal interest' which justi-

fies invading the peculiarly local jurisdiction of the States, in disregard of their laws, and of the subtleties reflected by the differences in the laws of the various States which generally reflect important and carefully evolved state arrangements designed to serve multiple purposes." p. 353, 86 S.Ct. p. 507.

Thus it is clear that even though the law in a particular area may differ from state to state, a uniform federal rule of decision does not necessarily have to disregard state law.

There can be no question but the New Jersey Public Utilities statute N.J.S.A. 48:1–1 *et seq.* was enacted to promote and protect the public interest and is peculiarly local in interest.

■ We note that in this matter, the SBA and the Bank negotiated the terms and conditions of the LHWC loan. They required among other provisions, personal guarantees, two different financing agreements under the state Uniform Commercial Code, they sought an assignment of the shares of stock of the LHWC and in fact, conditioned the granting of the loan upon a rate increase to be granted by the BPUC. There can be no question that both the Bank and SBA were clearly aware of the fact that LHWC as a public utility company had the limited capacity to enter into financial transactions requiring more than 12 months to repay and that the LHWC could only do so when authorized by the BPUC.

We have earlier noted that no one ever concerned themselves with advising the BPUC that they had changed the requirements for a mortgage on land. Thus while the SBA and the Bank continued to rely on BPUC approved rate increase to insure repayment of the loan obligation, they ignored the BPUC's authority and right to act upon and approve a petition which did not truly reflect the intent of LHWC, the Bank and SBA.

In the absence of any showing by the SBA that under the existing circumstances a uniform national rule is required to effectuate the purposes of the SBA program and that the adoption of existing state law as a federal rule of decision would frustrate the national SBA program, this Court in accordance with the decision rendered in *United States v. Yazell, supra,* finds that it will not override a state statute of strong local public interest. The Court also is of the opinion that as in the *Kimbell* case, *supra,* totally unwarranted confusion would arise in the area of public utility financing if the present scheme were disturbed. As noted in *Kimbell, supra* and *Yazell, supra,* the SBA does comply with the requirements of state law in negotiating loans, in fact as is quite clear here, it relies on state law to insure repayment of its loans. To allow it to ignore the provisions of the state public utility act could not be condoned.

In view of the above, this Court finds that to include state law as part of the federal rule of decision is warranted under the circumstances present in this case.

The language of the N.J.S.A. 48:3–7 speaks for itself. Any mortgage or encumbrance on its property payable more than one year after the date of the original indebtedness is void unless made in conformance with the provisions of the statute.

■ The SBA contends that the Bank and LHWC complied with the provisions of the November 21, 1979 BPUC order which provided for a mortgage. They allege that the term mortgage is susceptible to two interpretations—it can mean a real estate mortgage and it can mean a chattel mortgage. SBA argues that since a chattel mortgage and a UCC security agreement both convey an interest in personal property to insist on a mortgage would be placing form over substance. This argument presupposes that by the use of the term mortgage, the BPUC meant either chattel mortgage or real estate mortgage and granted LHWC the right to determine what meaning was to be given the term "mortgage."

It is noted that the Bank's commitment letter to LHWC and the LHWC petition to the BPUC clearly distinguished a UCC security interest on personal property from a real estate mortgage. Nowhere was the term chattel mortgage used.

It is also noted that where the BPUC considered the LHWC petition they considered the requirement to pledge and assign all of the corporate stock of LHWC and eventually denied this. They also discussed the requirement of the land mortgage. It is clear that they did not ignore this provision but expressly considered it and proceeded to issue its order which authorized the granting of "a mortgage on its utility plant." By doing so, it recognized the request of LHWC to encumber its personal property but did not desire to grant a UCC lien on said property.

In granting authorization to place a mortgage on its utility plant, the BPUC recognized the right of public utility companies to execute and record mortgages on a combination of realty and personalty. *See McFadden v. May's Landing and Egg Harbor City R.R. Co.*, 49 N.J.Eq. 176, 22 A. 932 (Ch.1891); *Williamson v. N.J. Southern R.R. Co.*, 29 N.J.Eq. 311 (Ch.1878).

Most significant are the provisions of N.J. S.A. 46:28–10 which provides for the validity of chattel mortgages included in a mortgage of franchises and real estate made pursuant to N.J.S.A. 46:28–14. N.J.S.A. 46:28–14 provided that the provisions of N.J.S.A. 12A:9–101 through 12A:9–507 of the Uniform Commercial Code of New Jersey shall not apply to any mortgage of personal property included in a real estate mortgage made by a public utility company, which real estate mortgage has been or shall be recorded in the county where the real estate is located. The Uniform Commercial Code of New Jersey in Section 12A:10–104 provided that this section among others were specifically saved from repeal.

It was in recognition of this practice and the above-noted provision of New Jersey statutory law that the BPUC granted the LHWC the authorization to mortgage its utility plant and not to enter into UCC financing agreements.

The SBA in contending that LHWC did comply with the provisions of the BPUC order further contends that the term "utility plant" includes all of the components of the security interest held by the Bank and SBÁ, which not only includes machinery, equipment and furniture, but also accounts receivable, contract rights and inventory.

The Bank however takes a position quite different from that taken by the SBA. The Bank asserts that the term of art, "utility plant" includes equipment, furniture and fixtures as covered by the first UCC security agreement. It carefully does not claim that the term utility plant includes accounts receivable, contract rights and inventory as covered by the second UCC security agreement. In asserting that equipment, furniture and fixtures are included in the term utility plant, it relies upon the Uniform System of Accounts Prescribed for Class D Water Utilities, adopted January 1, 1960 which provides as follows:

### BALANCE SHEET ACCOUNTS ASSETS AND OTHER DEBITS

1. *Utility Plant*
100. *Utility Plant*
110. Accumulated Provision for Depreciation and Amortization of Utility Plant
2. *Other Property and Investments*
121. Nonutility Property
122. Accumulated Provision for Depreciation and Amortization of Nonutility Property
124. Other Investments
125. Special Funds
3. *Current and Accrued Assets*
131. Cash and Working Funds
132. *Temporary Cash Investments*
141. *Notes Receivable*
142. *Customer Accounts Receivable*
143. *Other Accounts Receivable*
144. Accumulated Provision for Uncollectible Accounts
150. Materials and Supplies
165. *Prepayments*
170. *Other Current and Accrued Assets*
4. *Deferred Debits*
181. Unamortized Debt Discount and Expense
182. Extraordinary Property Losses
183. Other Deferred Debits

[emphasis ours].

In *Hamm v. Rockwood Sprinkler Co.*, 88 N.J.L. 564, 97 A. 730 (Sup.Ct.1916), the Court defined the word "plant" as follows:

"The word 'plant' in its ordinary acceptation, when used in connection with and relating to a business, includes everything other than supplies and stock in trade necessary and requisite to the carrying on of the business. It includes in the language of Lord Justice Lindley (*Yarmouth v. France*, L.R. 19, Q.B.Div. 647, 658): Whatever *apparatus* is used by a business man for carrying on his business-not his stock in trade which he buys or makes for sale-but all *goods* and *tools fixed or movable, live or dead*, which he keeps for *permanent* employment in his business. (emphasis added, at 568, 97 A. 730)."

The clear import of this construction of "plant" is that it is the permanent tangible apparatus which is used to carry on the business. *See also, Rose City Transit Co. v. City of Portland*, 18 Or.App. 369, 525 P.2d 1325, 1336 (1974); *Dwyer v. Town of Oyster Bay*, 28 Misc.2d 952, 217 N.Y.S.2d 392, 394 (1961).

With the foregoing in mind, it cannot be said that the security interest of the Bank in the accounts receivable, inventory and contract rights is a mortgage on the petitioner's (LHWC) utility plant. As the above demonstrates, accounts receivable, contract rights and inventory are not "plant," therefore the Bank did not have a mortgage on petitioner's utility plant, it had something different, an interest in, *inter alia*, accounts receivable, inventory, contract rights and fixtures.

In again advancing the argument of form over matter, the contentions of the Bank and SBA must be considered in the light of the specific and clear order of the BPUC which considered the requirement of a mortgage, considered the request for UCC financing agreements and concluded that it would only authorize a mortgage on the utility plant.

The principal underlying N.J.S.A. 48:3–7 has been accepted as New Jersey law as early as 1883 in the case of *Hackensack*

*Water Co. v. De Kay*, 36 N.J.Eq. 548 (E & A 1883). Therein, a water utility was reorganized and the owner and trustee of the utility which emerged from the reorganization contended that certain mortgages held by the plaintiff were invalid. The court observed that:

"Persons taking securities of this character are chargeable with knowledge of the power to make them as conferred by the charter. If the power granted by the charter is subject to a condition, relating either to the form in which the security shall be made in order to be valid, or to some preliminary proceeding extraneous to the acts of the corporation or its officers, securities issued not in the prescribed form, or without the preliminary proceedings had, are subject to the defenses in consequence thereof, even in the hands of *bona fide* holders. Thus, where the *statute* required such bonds to be certified across their face and to be registered, and declared that no bonds should be valid unless so registered, bonds issued without such registry and certificate were held to be void. *Morrison v. Inhabitants of Bernards*, 7 Vr. 219. So also, where the statute requires, as a preliminary to the issuing of bonds by a county, town or other corporation, that the assent of a certain proportion of voters or taxpayers shall first be obtained, this requisite is essential, and the absence of it will *avoid the bonds even as against innocent third parties. Hudson v. Inhabitants of Winslow*, 6 Vr. 437; *Green's Brice's Ultra Vires 531, and note*." (emphasis added, at 562–63).

The court ultimately decided in favor of the bondholders, but on the ground that the violations or irregularities advanced by the trustee and the owner were *not* predicated on a *statutory* violation but on a violation of the *corporate* charter of the reorganized utility. Herein, of course, it is a statutory violation, N.J.S.A. 48:3–7, which is advanced by the trustee.

Both the Bank and SBA from the inception of the loan transaction recognized the jurisdiction and authority of the BPUC

to pass upon the actions of public utility companies in New Jersey. They conditioned the granting of the loan on the approval of the BPUC of a LHWC request to grant an increased rate adjustment. In the face of this reliance upon and recognition of BPUC authority and its powers, the Bank and SBA's actions in not informing the BPUC of their change of the requirement regarding a land mortgage and thereafter refusing or neglecting to comply with the BPUC order which authorized a mortgage on the utility plant can only result in the invocation of that portion of N.J.S.A. 48:3–7 which provides any·encumbrance of the property of a public utility without the approval of the BPUC shall be void.

■ In its countermotion, the SBA contends that N.J.S.A. 48:3–7 and N.J.S.A. 48:3–9 are merely regulatory statutes and do not create a private cause of action. It directs the court's attention to the case of *Fox v. Fox*, 135 N.J.Eq. 186, 37 A.2d 194 (Ch. 1944) wherein the court stated that R.S. 48:3–9 was a "mere regulatory provision." The issue in that case was the number and type of shares of stock to be issued by the utility company and the ownership of said shares. There the PUC authorized the issuance of the shares of stock but did not attempt to determine who the stockholders would be or how many shares each would own. There was compliance with the statute so the case is of little precedential value on the issue of the existence of a private cause of action.

While the question of the existence of a statutory or private cause of action is one of statutory construction, there is precedent in New Jersey law for a non-regulated entity litigating an action based upon an interpretation of the very statute here before the Court. In the case of *In re West Jersey and Seashore Company*, 46 N.J.Super. 543, 135 A.2d 35 (App.Div.) *cert. denied*, 25 N.J. 491, 137 A.2d 114 (1957) the BPUC pursuant to N.J.S.A. 48:3–7 denied its approval of a sale of real estate owned by the West Jersey and Seashore Railroad Company. At the administrative hearing, the intended purchaser was admitted as an intervening party in interest. After the BPUC denied the petition to sell, the intended purchaser of the land and not the public utility company appealed the decision of the BPUC. A reading of the Court's Opinion in that case clearly indicates the Court's concern over the rights of the intervening third party.

It is worth noting that the BPUC fully supports the position of the trustee in this case (See the December 10, 1980 letter to this Court).

In accord with this result is 73 C.J.S. Public Utilities § 43a p. 1105:

"Where the consent of the commission to a particular act of a utility is required, an attempt to perform such an act without such consent is null and void, with the result that a purported transfer in violation of the statute confers no rights on the transferee, *and third persons may raise that defense*." (emphasis supplied).

*Slater v. Shell·Oil Co.*, 39 Cal.App.2d 535, 103 P.2d 1043 (Dist.Ct.App.1940); *Transport Clearings Bay Area v. Simmonds*, 38 Cal. Rptr. 116, 226 Cal.App.2d 405 (Dist.Ct.App. 1964).

■ The SBA also contends that by its very provision N.J.S.A. 48:3–7 does not require approval of the board on any grant, conveyance or release of any property of a public utility to the United States. This contention is completely without merit as the statute states that such provisions apply only when the conveyance of the property is intended for "public use" and that clearly is not the case here. That particular language concerns itself with condemnation type proceedings.

■ It is the opinion of this Court that the trustee in bankruptcy has standing to bring the instant action to determine the validity of the lien of the Bank and the SBA, he is not estopped from bringing this action by the previous acts of LHWC, that the federal rule of decision will incorporate N.J.S.A. 48:3–7 and N.J.S.A. 48:3–9 in determining the validity and priority of the lien asserted by the SBA, and the Court further finds that the lien asserted by the Bank and SBA is void *ab initio* as it did not

422

comply with the provisions of N.J.S.A. 48:3–7.

Submit an order in accordance with the above Opinion.