In re Susan A. McLAUGHLIN, Debtor.

Michael E. KEPLER, Plaintiff,

v.

SECURITY PACIFIC HOUSING
SERVICES, Defendant.

Bankruptcy No. 94–31936–7.
Adv. No. 94–3155–7.

United States Bankruptcy Court,
W.D. Wisconsin.

May 23, 1995.

Michael E. Kepler, Kepler & Peyton, Madison, WI, for plaintiff.

Dona J. Merg, Merg & Anderson, S.C., Madison, WI, for defendant.

## MEMORANDUM DECISION

ROBERT D. MARTIN, Chief Judge.

Susan McLaughlin wanted to purchase a new mobile home from Steenberg Homes ("Steenberg").[1] The purchase was to be funded in part by financing available through Steenberg. Security Pacific Housing Services ("SPHS") conditionally agreed to accept from Steenberg an assignment of McLaugh-

---

1. McLaughlin and her husband, Neal McLaughlin, purchased the mobile home together. However, they did not file bankruptcy jointly. Susan McLaughlin is the sole debtor in this case. Therefore, she is the only party referred to in this writing.

lin's retail installment contract. After the assignment, SPHS would receive the contract payments and hold a lien on the purchased mobile home. On April 27, 1994 McLaughlin signed a retail installment contract and security agreement with Steenberg and made a down payment. McLaughlin also signed a motor vehicle title application so that the lien she agreed to provide could be perfected. (Def. Ex. 7.)

On May 12, 1994, McLaughlin took delivery of the new home and began to reside in it. Steenberg promptly forwarded the required paperwork to SPHS. The papers had been received by SPHS when, on May 20, 1994, an employee of SPHS telephoned McLaughlin to determine her satisfaction with the home. After this conversation, the retail sales contract and security agreement were modified by the SPHS employee changing the due date of the first installment payment from June 1, 1994 to June 15, 1994. The revised agreement was dated May 15, 1994.

On May 31, 1994, SPHS accepted the assignment of McLaughlin's installment sale contract and security agreement.[2] On June 1, 1994, SPHS mailed a check to the manufacturer, Liberty Homes, for the amount due from Steenberg in exchange for the Manufacturers Statement of Origin ("MSO"). After receiving the MSO on June 10, 1994, SPHS

forwarded it and the application for registration to the motor vehicle department.[3] The application was received by the department on June 13, 1994 and a title showing the SPHS security interest was issued on July 2, 1994.

On July 21, 1994, McLaughlin filed for chapter 7 bankruptcy. The trustee moved to avoid the SPHS security interest as the fruit of a preferential transfer. A trial was held on March 29, 1995. At its conclusion, I made a preliminary holding that SPHS' security interest was perfected by a preferential transfer and that the ordinary course of business exception to a preferential transfer did not apply because, *inter alia,* there were irregularities in the transaction as it was handled by SPHS.[4]

By signing the security agreement on April 27, 1994, McLaughlin created a security interest in favor of Steenberg. Wis.Stat. § 409.105(m) (1993–94). However, the security interest was not enforceable against McLaughlin or any third party until it "attached." Attachment requires that the creditor give value and the debtor have rights in the collateral. Wis.Stat. § 409.203 (1993–94). Steenberg gave value and McLaughlin gained rights in the collateral when the mobile home was delivered to her possession on May 12, 1994.[5] *See Chambersburg Trust Co.*

---

**2.** The testimony of the SPHS sales manager did not make clear what, if any, formal step marked the SPHS acceptance, but the date of the acceptance is not contested.

**3.** A security interest in a mobile home or motor vehicle is perfected by an application for a certificate of title. Wis.Stat. § 342.19 (1993–94). In Wisconsin, a Manufacturers Statement of Origin ("MSO") is required to perfect a security interest in a new vehicle. Wis.Stat. § 342.06(1)(d) (1993–94).

**4.** Specifically, I stated:

[T]hat there were errors perceived to be on the contract and that those were uncommon. That the correction to the errors was undertaken in a way that is not the common way of doing it. It does appear that new figures were scratched onto the contract. The confirmation letter was sent. There is nothing to suggest that that's the way its done in the industry, although, there was some general statements that everything was in the normal course. I don't find that credible in light of the other

testimony. That was unusual. There is no evidence as to the course of business of perfecting security interest other than the defendant under *Tolona Pizza* in the 7th Circuit. (TR 166.)

**5.** The identification of a good in a contract creates a special property interest. Wis.Stat. § 402.501 (1993–94). This special property interest is sufficient to create rights in property so that a security interest may attach. Grant Gilmore, *Security Interests In Personal Property* § 11.5 (1965). At the time the sales contract was signed, the mobile home was not yet built. Thus, it was a future good. Wis.Stat. § 402.105(1)(b) (1993–94). Under Wis.Stat. § 402.501(1)(b) (1993–94), identification of a future good occurs when the good is shipped, marked or otherwise designated as the goods to which the contract refers. There has been no evidence of when the home was shipped, marked or otherwise designated. Because this date cannot be determined, at the very latest, McLaughlin acquired rights in the home on the date she acquired possession, May 12, 1994.

*v. Eichelberger*, 403 Pa.Super. 199, 588 A.2d 549, 552 (Pa.Super.Ct.1991). The security interest then became enforceable against McLaughlin, but it could still be primed or defeated by third parties until it was perfected.

When the security interest attached, the contract had yet to be assigned to SPHS. Under the terms of the security agreement, Steenberg was the secured party. Steenberg did not perfect the security interest on its own behalf and it remained unperfected until an application for title was delivered to the motor vehicle department on June 13, 1994. Wis.Stat. § 342.19(2) (1993–94). Nothing in Wisconsin law deems the perfection to relate back to an earlier date.[6]

Section 547(b) requires six elements be shown to avoid a transfer as a preference. "The trustee must show that: a transfer of the property of the debtor to or for the benefit of a creditor, for or on account of antecedent debt, while the debtor is insolvent, within 90 days preceding the petition, and the creditor has received more than what the creditor would have received under chapter 7." *In re Ausman Jewelers*, 177 B.R. 282, 284 (Bankr.W.D.Wis.1995); *see also Matter of Smith*, 966 F.2d 1527 (7th Cir. 1992). Each of these elements has been met in this case.

6. Under Wis.Stat. § 342.19(2) (1993–94), perfection may relate back to the date the security interest was created if it is perfected within 10 days of its creation. However, if perfection occurs beyond this 10 day period, as in this case, a lien in a mobile home is deemed perfected as of the date of delivery to the motor vehicle department of the application for certificate of title.

7. 11 U.S.C. § 547(e)(2)(B) provides:

   (2) For the purposes of this section, except as provided in paragraph (3) of this subsection, a transfer is made . . .
   (B) at the time such transfer is perfected, if such transfer is perfected after such 10 days.

8. 11 U.S.C. § 101(10) (1994) provides:

   (10) "creditor" means
   (A) entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor;
   (B) entity that has a claim against the estate of a kind specified in section 348(d), 502(f), 502(g), 502(h), or 502(i) of this title; or

Cases have widely held that giving a security interest in property constitutes transfer of property of the debtor. *See In re Melon Produce*, 976 F.2d 71, 74 (1st Cir. 1992). When a security interest is not perfected within 10 days after it becomes enforceable, the date of perfection is the date of the transfer. 11 U.S.C. § 547(e)(2)(B) (1994);[7] in the present case, June 13, 1994. McLaughlin is presumed to have been insolvent because the transfer occurred within 90 days of her bankruptcy filing. 11 U.S.C. § 547(f) (1994). The transfer was to SPHS, which by then was a creditor of McLaughlin[8] on account of an antecedent debt.[9] When the home was delivered, McLaughlin had an obligation to pay for it. The questioned transfer took place 32 days later. Finally, SPHS does not dispute that it received more than what it would have received under chapter 7 without the transfer.

Section 547(c) of the Bankruptcy Code provides that certain transactions, although preferential, cannot be avoided by the trustee. The first exception claimed by SPHS, that for ordinary course of business, has already been denied. SPHS also contends that either 11 U.S.C. § 547(c)(1), the contemporaneous exchange exception, or 11 U.S.C. § 547(c)(4), the new value exception, applies to these facts. On the evidence as presented, neither section applies.

   (C) entity that has a community claim.
   By the time of filing, McLaughlin was obligated to pay SPHS the payments due under the sales contract.

9. The antecedent debt need not have been first owed to the recipient of the transfer, it is enough that the transferee has been assigned a debt which is antecedent. "The substantive rights of the parties to the assignment . . . are determined by the pre-Code law of assignment, which has not been displaced by the Code and therefore continued under the Code." 68A Am.Jur.2d *Secured Transactions* § 285 (1993). A valid and unqualified assignment, as in this case, operates to transfer to the assignee all rights, title, or interest of the assignor in the thing assigned. *Kornitz v. Commonwealth Land Title Ins. Co.*, 81 Wis.2d 322, 327, 260 N.W.2d 680 (1977); *Matter of Lake Hopatcong Water Corp.*, 15 B.R. 411, 416 (Bankr.D.N.J.1981). Thus, SPHS stood in Steenberg's shoes. Because Steenberg's debt was antecedent when the contract was assigned, SPHS acquired an antecedent debt.

The contemporaneous exchange exception provides:

> (c) The trustee may not avoid under this section a transfer—
>
>> (1) to the extent such transfer was—
>>
>>> (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and
>>>
>>> (B) in fact a substantially contemporaneous exchange.

11 U.S.C. § 547(c)(1). The parties do not dispute that McLaughlin and SPHS intended the transaction to be contemporaneous. Rather, they disagree on whether the transfer was "in fact" contemporaneous.

█ The trustee argues that perfection of the security interest was not contemporaneous because it did not occur within 10 days of its creation.[10] Several courts outside of this circuit have so held. *See Matter of Tressler,* 771 F.2d 791 (3d Cir.1995); *In re Davis,* 734 F.2d 604 (11th Cir.1984); *In re Arnett,* 731 F.2d 358 (6th Cir.1984); *Matter of Vance,* 721 F.2d 259 (9th Cir.1983).

█ However, the Seventh Circuit follows a different rule. In *Pine Top Ins. v. Bank of America Nat. Trust & Sav.,* 969 F.2d 321, 328 (7th Cir.1992), the court rejected the proposition that to be contemporaneous in fact, a transfer must occur within 10 days of it becoming effective. "[T]he modifier 'substantial' makes clear that contemporaneity is a flexible concept which requires a case by case inquiry into all of the relevant circumstances (e.g., length of delay, reason for delay, nature of the transaction, intentions of the parties, possible risk of fraud) surrounding an allegedly preferential transfer." *Id.* at 329. Thus, the particular facts of the present case must be examined.

After accepting the assignment on May 31, 1994, SPHS took immediate steps to perfect its security interest. SPHS paid Liberty Homes to obtain an MSO and, after receiving it, immediately applied to the motor vehicle department for a title. The actual process of perfecting the security interest was completed as soon as possible after SPHS started it.

However, the process of perfection was not initiated until 19 days after the security interest attached. From May 12, 1994 to May 31, 1994, neither Steenberg nor SPHS attempted to perfect a security interest in the home. SPHS claims that it could not have perfected the security interest prior to May 31, 1994. However, the evidence suggests that SPHS had all of the information necessary to approve the transaction on May 18, 1994 (Def. Ex. 26) and probably sooner. At trial, SPHS' sales manager testified that all of the required information to finalize the transaction was in SPHS' possession within the first two weeks of May. At any time thereafter, SPHS could have finalized its acceptance and initiated the perfection process.

SPHS has offered little justification for its delay. Rather, it focused on events occurring after May 31, 1994. To the extent that SPHS presented evidence to justify its delay, it conflicted with other evidence. At trial, SPHS' sales manager testified that SPHS employees were too busy to initiate the process earlier. However, SPHS' internal purchase log shows that in similar transactions occurring around the same time as McLaughlin's, SPHS took steps to perfect their security interest much more quickly following telephone audits. For an example, *inter alia,* the telephone audit for account number 72201253 occurred on May 25, 1994 and SPHS purchased the contract on the same date. (Def. Ex. 31.) The telephone audit for account number 72201255 occurred after McLaughlin's, yet that contract was purchased before McLaughlin's. SPHS has not provided a reasonable explanation as to why the McLaughlin transaction took as long as it did.

█ As the party from whom recovery is being sought, SPHS has the burden of proof in establishing that an exception to the avoidance of a preferential transfer exists. 11 U.S.C. § 547(g) (1994). Because there has

---

**10.** The trustee argues that the security interest must be perfected within 10 days of its creation in order to be "in fact" contemporaneous. However, § 547(e) provides that the transfer must be perfected within 10 days after the transfer takes effect. Presumably, this would be the date of attachment and not necessarily the date of creation.

been little evidence presented concerning the days from May 18 until May 31, 1994, SPHS has not sustained its burden of proof. When those 13 days are part of the 32 days that elapsed from attachment to perfection of SPHS' interest, perfection cannot be said to be contemporaneous.

■ SPHS next contends that the new value exception in § 547(c)(4) applies. That section provides:

> (c) The trustee may not avoid under this section a transfer—
>
> .    .    .    .    .
>
> (4) to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor.
>
>> (A) not secured by an otherwise unavoidable security interest;
>>
>> (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor.

11 U.S.C. § 547(c)(4) (1994). SPHS argues that it advanced new value to McLaughlin which allowed her to purchase the home. However, SPHS' reliance on the new value exception is misplaced. This exception only applies to creditors who have received avoidable preferences and thereafter make further loans to the debtor. 11 U.S.C. § 547(c)(4)(A) (1994); Robert E. Ginsberg & Robert D. Martin, *Bankruptcy: Text, Statutes & Rules* (1993). The exception allows a creditor to set off the amount of post-preference advances that are both unsecured and unpaid on the petition date against any amounts the creditor must return to the trustee under the preference provision. In our case, SPHS is not seeking set off nor did it advance any unsecured funds after the security interest was perfected. Thus, the exception is not applicable.

If a preference is voidable, the trustee may recover from either the initial transferee (or the entity for whose benefit the transfer was made) or any immediate or mediate transferee of the initial transferee under 11 U.S.C. § 550. At the very least, SPHS was Steenberg's immediate transferee by virtue of being first recipient of the security interest's perfection. It could also be argued that SPHS was the entity for whose benefit the transfer was made. Under either characterization, the trustee in this case may recover against SPHS.

■ Having determined that a preferential transfer has taken place to which there is no applicable exception and that recovery may be had against SPHS, the inquiry must be directed to the appropriate remedy. Section 550(a) provides:

> (a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property.

When a preferential transfer is avoided, the plain language of § 550(a) allows the trustee to recover the property transferred or its value. However, the section does not offer any guidance in determining which remedy the trustee should receive. *In re Classic Drywall, Inc.,* 127 B.R. 874, 876 (D.Kan. 1991); *In re International Ski Service, Inc.,* 119 B.R. 654, 656 (Bankr.W.D.Wis.1990). Cases have held that the language of § 550 requires that the court order the property returned unless it would be inequitable to do so. *In re General Industries, Inc.,* 79 B.R. 124, 135 (Bankr.D.Mass.1987); *In re Morris Communications NC Inc.,* 75 B.R. 619 (Bankr.W.D.N.C.1987), *rev'd on other grds.,* 914 F.2d 458 (4th Cir.1990). Other cases, however, suggest that the decision to return the property or its value is at the discretion of the bankruptcy court. *International Ski,* 119 B.R. at 656; *see also In re First Software Corp.,* 107 B.R. 417, 423 (D.Mass.1989); *In re Vedaa,* 49 B.R. 409, 411 (Bankr.D.N.D. 1985).

■ Generally, where the record contains no or conflicting evidence of the market value of the transferred property, the courts have ordered that the property be returned. *See In re King Arthur Clock Co., Inc.,* 105 B.R. 669, 672 (Bankr.S.D.Ala.1989); *In re General Industries, Inc.,* 79 B.R. 124, 135 (Bankr.D.Mass.1987); *In re Handsco Distributing, Inc.,* 32 B.R. 358, 360 (Bankr.

S.D.Ohio 1983); *In re Vann,* 26 B.R. 148, 149 (Bankr.S.D.Ohio 1983). "Where the property is unrecoverable or its value diminished by conversion or depreciation, courts will permit the recovery of value." *Classic Drywall,* 127 B.R. at 877. However, if the market value of the property can be readily determined and would work a savings for the estate, the trustee may recover value rather than the property. *International Ski,* 119 B.R. at 657. The market price at the time of transfer is the proper measure of § 550 damages. *Id.* at 659.

In the present case, the transferred property is recoverable and there has been no allegation that the value of the property has diminished. In April, 1994, the mobile home's purchase price was $38,160 plus tax. McLaughlin paid a $7,000 down payment, leaving a debt of $31,160 plus tax in April 1994. This, plus any accrued interest, is the maximum value of SPHS' lien in the property.

The value of the lien is related to the market price of the home. Other than the purchase price, no party has provided any evidence of the mobile home's value. The purchase price may or may not be the home's market value. *See King Arthur Clock,* 105 B.R. 669, 672 (Bankr.S.D.Ala.1989). Ascertaining the value of a mobile home differs from determining the value of the machinery and supplies returned in *International Ski.* In *International Ski,* 119 B.R. at 659, the debtor had returned machinery for which it had not yet paid. In exchange, the creditor credited the debtor what the debtor had agreed to pay for the goods. The court determined this amount to be the value of the property. *Id.* Presumably, the creditor could easily resell the goods which the debtor had returned to another buyer for the same price the debtor had agreed to pay. However, unlike the goods in *International Ski,* the mobile home had been used for approximately one month before the transfer took place, a seller may not be able to find a buyer willing to pay the same price that McLaughlin did.

In any event, the value of SPHS' lien cannot be readily determined on the evidence produced. Therefore, the trustee is entitled to recover the lien but not money damages equal to its value. An order may be entered transferring the lien on McLaughlin's mobile home from SPHS to the trustee and requiring SPHS to take whatever steps are required to accomplish that transfer.

This memorandum decision together with my prior ruling on the record constitute my findings of fact and conclusions of law in this matter.

### ORDER

The court having this day entered its memorandum decision in the above-entitled matter;

IT IS HEREBY ORDERED that Security Pacific Housing Services' lien in the mobile home of Susan A. McLaughlin be avoided as a preferential transfer.

IT IS FURTHER ORDERED that the lien be transferred to the trustee and that Security Pacific Housing Services take whatever steps are required to accomplish that transfer.