## In re MORRIS COMMUNICATIONS NC INC., I.D. No. 56–1335778, Debtor.

## Langdon M. COOPER, Trustee in Bankruptcy for Morris Communications NC, Inc., Plaintiff,

v.

## ASHLEY COMMUNICATIONS, INC. et al., Defendants.

Bankruptcy No. C–B–85–00365.
Adv. P. No. 85–0177.

United States Bankruptcy Court,
W.D. North Carolina,
Charlotte Division.

July 8, 1987.
As Amended July 15, 1987.

---

1. The Debtor has stated that the property is now listed for sale with a price of $200,000.00.

Langdon M. Cooper, of Mullen, Holland & Cooper P.A., Gastonia, N.C., for plaintiff Trustee.

Joseph W. Grier, III, of Grier & Grier, Charlotte, N.C., for defendants Ashley Communications, Inc., Lynn H. Martin, William G. Martin and Ashley E. Martin.

James L. Mason, Jr., of Gerdes, Mason, Brunson, Wilson, Tolbert and Simpson, Charlotte, N.C., for defendant Horace A. Morris, Jr.

Nicholas A. Carrera, Xenia, Ohio, and John C. Holden, Dayton, Ohio, for defendants Elden Jr. Heinz and C–PACT, Inc.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

MARVIN R. WOOTEN, Bankruptcy Judge.

THIS MATTER coming on to be heard and being heard before the undersigned Judge Presiding over the United States Bankruptcy Court for the Western District of North Carolina on June 3–5, 1987 for a bench trial on the complaint of Langdon M. Cooper, Trustee in Bankruptcy for Morris Communications NC, Inc., Debtor, seeking

to avoid under Section 548 of the United States Bankruptcy Code a certain transfer of stock made to the defendant Ashley Communications, Inc.; and the plaintiff Trustee being represented by Langdon M. Cooper, Esq. of Mullen, Holland & Cooper P.A., Attorneys at Law, Gastonia, North Carolina; and the defendants Ashley Communications, Inc., Lynn H. Martin, William G. Martin and Ashley E. Martin being represented by Joseph W. Grier, III, Esq. of Grier & Grier, Attorneys at Law, Charlotte, North Carolina; and the defendant Horace A. Morris, Jr. being represented by James L. Mason, Jr., Esq. of Gerdes, Mason, Brunson, Wilson, Tolbert and Simpson, Attorneys at Law, Charlotte, North Carolina; and defendants Elden Jr. Heinz and C–PACT, Inc. being represented by Nicholas A. Carrera, Esq., Attorney at Law, Xenia, Ohio and John C. Holden, Esq., Attorney at Law, Dayton, Ohio; and the Court, after reviewing the record, considering the evidence presented at trial, and hearing the arguments of counsel, pursuant to Bankruptcy Rule 7052 makes the following FINDINGS OF FACT AND CONCLUSIONS OF LAW:

## FINDINGS OF FACT

1. Morris Communications NC, Inc., a North Carolina corporation (the "Debtor"), owned 260 shares of the common stock of C–PACT, Inc., a North Carolina corporation ("C–PACT"). This case involves the Debtor's transfer for $5,000 on 17 May 1984 (the "Transfer") of these 260 shares of C–PACT common stock (the "Transferred C–PACT Stock") to the defendant Ashley Communications, Inc., a North Carolina corporation ("Ashley"). The Transferred C–PACT Stock represents 26% of the outstanding capital stock of C–PACT and at the time of the trial was still owned by Ashley and held by the Clerk of Court in Ohio. At the time of the trial the Transferred Stock was worth in excess of $300,000.

2. The plaintiff, Langdon M. Cooper, Trustee in bankruptcy for the Debtor (the "Trustee") alleged in his complaint that the Transfer was a fraudulent transfer within the meaning of Section 548(a)(2) of the United States Bankruptcy Code (the

"Code") and Section 39–15 of the North Carolina General Statutes through Section 544(b) of the Code. The Trustee and Ashley stipulated that the Transfer was a transfer of an interest of the Debtor in property made while the Debtor was insolvent and within one year before the date of the filing on 10 May 1985 of the involuntary Chapter 7 petition against the Debtor. The Trustee and Ashley also stipulated that the Transfer was not made with the intent to hinder, delay or defraud the creditors of the Debtor.

3. The four principal issues before the Court were the following: (i) whether the Debtor received less than a reasonably equivalent value in exchange for the Transferred C–PACT Stock; (ii) whether Ashley was a good faith transferee; (iii) assuming the existence of an avoidable transfer under Section 548(a)(2) of the Code, whether the Trustee or Ashley was entitled to the appreciation in the value of the Transferred C–PACT Stock occurring after the Transfer; and (iv) whether Ashley is in any event entitled to a claim pursuant to Sections 548(c) or 550(d) of the Code for value paid or improvements made. A fifth issue before the Court was whether certain liquidation expenses incurred by C–PACT were reasonable.

4. The Trustee filed this adversary proceeding against Ashley and other defendants on 20 June 1985. Prior to trial the Trustee dismissed the action with respect to Nicholas A. Carrera, Erma A. Heinz and Carrera, Hurley and Van Horn, and the Court entered default judgments against C–PACT and Frank M. Warlick and Katherine Warlick. Pursuant to the Court's Pre-trial Order entered on 4 March 1987, the case was bifurcated and the resolution of all of the pending cross-claims and counterclaims in this action were reserved until the resolution of the Trustee's claims against the defendants. Thus, only the Trustee's claims against the defendants were before the Court.

5. On 17 May 1984 C–PACT had essentially no liabilities and a single asset—one of the twenty-two non-wireline applications

filed with the Federal Communications Commission ("FCC") for a cellular radio telephone construction permit and operating license in the Charlotte-Gastonia Standard Metropolitan Statistical Area ("SMSA"). The fair market value of the Transferred C–PACT Stock at all relevant times was directly related to the fair market value of C–PACT's sole asset. Thus, the Court first determined the fair market value of C–PACT's non-wireline cellular application in May, 1984. An understanding of the history of the cellular radio telephone industry and the FCC's process for issuing operating licenses was a prerequisite to the Court's decision.

### General Background Of The Cellular Radio Industry and the License Process

6. Cellular radio communications began as a concept in a Notice of Inquiry issued by the FCC in 1968. In March 1982, the FCC authorized this new form of mobile telephone service made possible by the application of cellular radio telecommunications technology. Cellular systems use multiple low power transmitters that broadcast within small, contiguous, geographically dispersed areas, referred to as "cells," and a sophisticated computerized switching terminal that monitors and allocates available frequencies to users traveling from cell to cell, including automatically "handing-off" an on-going conversation or other communication without noticeable interruption as the caller travels from one cell to another. Unlike conventional or traditional mobile telephone systems, a cellular radio telephone system has virtually unlimited subscriber capacity and the quality of the service generally meets or exceeds that of the existing conventional telephone systems. Using a cellular telephone, anyone can place calls to, and receive calls from, any other phone in the world, all with no operator assistance. The technology was exciting and by May, 1984 many well-financed and legitimate entrepreneurs had filed cellular applications and were posturing for strong positions in the marketplace.

7. The FCC regulates use of the electromagnetic spectrum pursuant to the Communications Act of 1934. This Act empowers the FCC to issue exclusive licenses for the right to use the electromagnetic spectrum in specific geographic areas as determined by the FCC. In 1982, the FCC developed a plan by which a portion of the 800 MHz frequency band of the electromagnetic spectrum would be allocated to cellular radio telephone systems, and those systems would be introduced into the marketplace. This plan divided the country geographically into "markets" based on the 1980 census figures for SMSA's and provided for the granting of two cellular operating licenses within each market, that is, within each SMSA. The SMSA's were aggregated by size into groups with thirty SMSA's in each group, or "round" as a group came to be called. The FCC opened each round periodically for the filing of cellular license applications. Round One contained the thirty most populated markets.[1]

8. The FCC's plan provided that in each SMSA two competing licenses would be awarded. One cellular operating license would be granted to a "wireline" operator, that is an established telephone company which would operate in that SMSA. The other cellular operating license would be granted to a "non-wireline" operator, that is any party other than an established telephone company. The FCC plan further provided that each entity desiring to establish a cellular telephone system was required to file an application to obtain an FCC construction permit and license. Subsequently, the FCC would hold comparative hearings within each SMSA to choose the best wireline applicant and the best non-wireline applicant to whom the two construction permits, and subsequently operating licenses, for that SMSA would be issued. Wireline applicants competed against only wireline applicants, and non-wireline against only non-wireline.

9. On 7 June 1982 the FCC accepted wireline and non-wireline applications for

---

1. In 1986, a scandal developed over the improper "marketing" of applications in the subsequent rounds. This case has nothing to do with those developments or rounds.

licenses in the first thirty SMSA's, that is, the first "round." Subsequently, the applicants filed various cross pleadings, and the FCC conducted hearings. There were however, numerous appeals by losing applicants through the FCC's administrative process and into the federal court system. The FCC's comparative hearing procedure was very costly and time consuming (up to $2 million for some applicants), and the FCC's issuance of the construction permits and licenses did not proceed smoothly.

10. In April, 1983, the FCC announced a policy of encouraging settlements among both wireline and non-wireline cellular applicants with competing cellular license applications in any given market to avoid the time-consuming comparative hearings which delayed the start of service to the public. If an SMSA became "fully settled," that meant all applicants for either the non-wireline or wireline license had pooled their respective applications. Since there were then no longer any competing applicants, a full market settlement assured the settlement group that it would be issued either the non-wireline or wireline license, whichever was applicable. A "partial settlement" occurred when two or more applicants in the SMSA had joined together. Because the partial settlement group would have as many chances to prevail as it had applications, partial settlements increased an applicant's "odds" of obtaining a share of one of the two licenses which would be issued in that SMSA. During May, 1984, the value of an application for a cellular license was directly related to the likelihood that the application would be successful and result in the FCC's awarding one of the two cellular licenses for that SMSA. Settlements increased the likelihood of success. Therefore, in May, 1984, how one viewed the likelihood of settlements in an SMSA directly affected the value of a cellular application in that SMSA, that is, the more likely a settlement, the higher the value of the application. By May, 1984, either full or partial market settlements had occurred among the non-

wireline applicants in most of the first round of SMSA's.

11. The wireline applicants quickly recognized the wisdom of settling with their competitors, and consequently there were early full market settlements among wireline applicants. For example, the first thirty SMSA's were fully settled by the wireline applicants by late 1982. The wireline applicants in the Charlotte-Gastonia SMSA fully settled on 6 February 1984. The wireline settlements allowed the telephone companies to obtain FCC construction permits, set up operation, obtain one of the two licenses for that SMSA and get a "head-start" on the non-wireline applicants in each applicable market. This "head start" was generally considered important because the first party to enter each SMSA to sell cellular products and service to the public would likely capture the first interested customers.

12. Because of the increasing publicity in 1983 in the national press of the huge profit potential in operating a cellular telephone system, the number of non-wireline filings increased in each round, and by the fall of 1983, the comparative hearing process had grown sufficiently cumbersome that on 28 October 1983 the FCC published for comment a proposed regulation under which cellular construction permits and licenses would no longer be awarded by the FCC on a comparative hearing basis, but instead on a lottery system. The FCC lottery proposal was formally adopted by the FCC on 11 April 1984.

13. In February, 1984, a group consisting of many of the "major" nationwide non-wireline communications companies reached an agreement to settle and pool their applications in each SMSA in which they had filed applications. They then formed a separate partnership in each SMSA known as the "Grand Alliance." The Grand Alliance included ten of the twenty-two non-wireline applicants in the Charlotte-Gastonia SMSA.

14. C–PACT was one of the twelve "non-Grand Alliance" applicants in the Charlotte-Gastonia SMSA.[2] Settlement dis-

2. The Charlotte-Gastonia SMSA was market # 61, the first market in Round Three (markets 61 through 90).

cussions among "non-Grand Alliance" non-wireline applicants continued throughout the early spring of 1984. By 17 May 1984 ten of the twelve non-Grand Alliance applicants in the Charlotte-Gastonia SMSA (including C–PACT) had agreed to settle and pool their applications to form their own partnership called the "Greater Alliance." On 17 May 1984 the odds of C–PACT's group of ten winning the lottery for the non-wireline license in the Charlotte-Gastonia SMSA were ten out of twenty-two or almost one out of two. Effective 11 June 1984 all of the twelve non-Grand Alliance applicants in the Charlotte-Gastonia SMSA formally entered an agreement and formed a partnership known as Cellular System One of Charlotte-Gastonia, and the partnership's odds of winning the non-wireline license in the Charlotte-Gastonia SMSA increased to twelve out of twenty-two for C–PACT's group.[3]

15. The ten Grand Alliance applicants in the Charlotte-Gastonia SMSA and the twelve applicants who comprised Cellular System One of Charlotte-Gastonia eventually reached a full market settlement, and on 28 September 1984 all twenty-two non-wireline applicants in the Charlotte-Gastonia market formally executed documents to form a partnership called Charlotte Cellular Telephone Company, which meant that no lottery would occur for the non-wireline license in the Charlotte-Gastonia SMSA.

16. Because of the full market settlement on 28 September 1984 C–PACT's single asset was a ½₂nd partnership interest in Charlotte Cellular Telephone Company. The twenty-two partnership shares of the Charlotte Cellular Telephone Company were freely sold and traded by the owners from 28 September 1984 to early 1985, generally at prices of $200,000 to $300,000 each.

17. By 17 May 1984 many factors induced opposing non-wireline applicants (such as the twenty-two applicants in the Charlotte-Gastonia SMSA) to settle their differences by forming partnerships in which each applicant would share in the funding, operation and profits of the non-wireline cellular system within a particular SMSA. Some of those factors were: (i) initially, the expense and delay of comparative hearings; (ii) later, the risk of losing all investment costs and opportunity in a lottery; (iii) the FCC's policy of encouraging settlements; (iv) the "head-start" of wireline systems; and (v) the formation of the Grand Alliance in February, 1984.

18. Full market settlements had by no means been assured on 17 May 1984, although some non-wireline applicants believed in May 1984 that full market settlements among all non-wireline applicants would have to occur because too much investment of time and money was at stake to risk losing. For example, using industry-wide averages, the twenty-two non-wireline applicants in the Charlotte-Gastonia SMSA might have invested in the aggregate $660,000 to $3,300,000 just in the cost of preparing and filing applications. Management could not risk their investment by "rolling the dice" in a lottery. Applicants worked to achieve settlements so the owners of fractional shares in each SMSA market could trade with other applicants in other SMSA's around the country to acquire full or majority ownership of certain SMSA's. This belief that full market non-wireline settlements had to occur in Rounds Two and Three was borne out by actual developments. By September, 1984, full market settlements had occurred in fifty-eight of the sixty non-wireline Round Two and Three markets, including the Charlotte-Gastonia SMSA. In those fifty-eight SMSA's the FCC was never required to hold a lottery.

19. Donald DePriest and David Richards, who in May, 1984, were President and General Counsel respectively of Charisma

---

3. Knight-Ridder, one of the twelve Non-Grand Alliance applicants in the Charlotte-Gastonia SMSA, had agreed to settle, but was in the process of a corporate reorganization, and de-layed executing the partnership agreement for Cellular System One of Charlotte-Gastonia until 27 June 1984. It was executed effective 11 June 1984.

Communications Corporation, one of the twenty-two applicants in the Charlotte-Gastonia SMSA, and Chris Witze, who in May, 1984, was President of Metro-Mobile CTS, also one of the twenty-two applicants in the Charlotte-Gastonia SMSA, each of whom qualified as expert value witnesses testified that as of 17 May 1984, each would have purchased the Transferred C–PACT Stock for $45,000 to $53,000. Herschel Shosteck, the expert value witness for Ashley, believed that a fair value for the Transferred C–PACT Stock on 17 May 1984 was anywhere between $3,900 and $78,000.

20. In light of the greater weight of all of the evidence, the credibility of all witnesses and the basis upon which their testimony was given, including four disinterested expert value witnesses, the Court concludes that on 17 May 1984 the fair market value of C–PACT's cellular application in the Charlotte-Gastonia SMSA was at least $192,307, twenty-six (26%) percent of which is $50,000. Therefore, on 17 May 1984 the fair market value of the Transferred C–PACT Stock was at least $50,000.

*History Of The Debtor*

21. In July, 1982, the Debtor was incorporated and began conducting a paging and radio sales business in North Carolina. The original stockholders of the Debtor, and their percentage of ownership, were: Morris Communications, Inc., (a South Carolina corporation, 25%; James Berns ("Berns"), 35%; and Viebeek Houdstermaatschappij BV., a Dutch holding Company, ("Viebeek"), 40%. In January, 1983, the defendant Elden Jr. Heinz ("Heinz"), an experienced non-wireline applicant in other SMSA's, met with Berns and the defendant, Horace A. (Jack) Morris ("Jack Morris"), the sole shareholder of Morris Communications, Inc., to discuss the prospects of filing a non-wireline cellular application in the Charlotte-Gastonia SMSA. T.A. Associates[4] agreed to provide the financial backing for this venture and in late February, 1983, C–PACT was formed as a North Carolina corporation with the Debtor

owning 26% of the capital stock, Heinz owning 25% of the capital stock, and Advent IV Capital Company and Chestnut Capital Corporation together owning 49% of the capital stock. Heinz provided the necessary engineering. The Debtor was to provide a local presence. The Debtor, Advent and Chestnut had foreign investors. Experienced FCC counsel in Washington approved the foreign ownership/control of C–PACT and its stockholders and C–PACT's cellular application qualified under all FCC regulations and related laws. In early 1983, with the consent of all C–PACT stockholders, Heinz prepared C–PACT's application for submission to the FCC under the comparative hearing format, and on 8 March 1983 C–PACT filed its Round Three non-wireline application with the FCC to obtain the non-wireline construction permit and license to operate a cellular system in the Charlotte-Gastonia SMSA.

22. The Debtor did not prosper financially during the summer of 1983 and in August, 1983, Berns hired Frank Warlick ("Warlick") as a sales representative for the Debtor. In November, 1983, Berns and Viebeek sold their common stock in the Debtor to Warlick for a note and pledge to Viebeek of the stock sold by Berns and Viebeek. As a result, Warlick was the record owner of 75% of the capital stock of the Debtor. Morris Communications, Inc. continued to own 25% of the capital stock of the Debtor. As of November, 1983, the C–PACT Stock was booked at $260.00 on the Debtor's books.

23. In January, 1984, Warlick violated FCC regulations, and the FCC subsequently fined the Debtor. The Debtor's business declined and by late February or early March, 1984, the Debtor was delinquent on rent, equipment lease and note payments to Purchase Finance, Inc., the Debtor's landlord, equipment lessor and major unsecured creditor. In March, 1984, Harry Berzack ("Berzack"), President of Purchase Finance, Inc., caused Purchase Finance to take physical possession of the Debtor's offices and all equipment leased to the

---

**4.** T.A. Associates manages many limited partnerships and corporations, including Advent IV Capital Company & Chestnut Capital Corpora-
tion, the two entities who owned in the aggregate 49% of the common stock of C–PACT.

Debtor. By the end of May, 1984, Warlick had liquidated essentially all of what remained of the Debtor's assets, including the Transferred C–PACT Stock, which was carried on the Debtor's books at its par value of $260.

24. The defendant Lynn Martin ("Martin"), the President of Ashley, became involved with the Debtor and with C–PACT through her association with Jack Morris and Warlick whom she met in late 1983. Throughout the fall and winter of 1983 and into spring of 1984, Warlick, Martin, Jack Morris and Heinz had various meetings, telephone conferences and correspondence regarding mutual business interests. On occasion the parties discussed developments in the cellular industry generally and the importance and value of C–PACT's cellular application. Martin testified that she did not recall discussions regarding the cellular industry generally or the importance and value of C–PACT's cellular application prior to May 14, 1984, when she was offered the C–PACT Stock.

25. Jack Morris testified that in March, 1984, he called Martin and informed her that he was resigning as a director of the Debtor, that she should not trust Warlick, that Purchase Finance, Inc. had repossessed almost all the Debtor's operating equipment, and that as a practical matter the Debtor was out of business. Martin testified that she recalled Morris informing her that he had resigned as a director of the Debtor and that Warlick did not have the personal resources he professed to have. She also testified that the Debtor appeared to be in business, and that she was able to contact him through his business telephone number.

26. At some point during March or April, 1984, Jack Morris informed Heinz of both the FCC fine which Warlick had caused, the insolvency problems of the Debtor and Warlick's untrustworthiness. Jack Morris and Heinz discussed the possibility that these insolvency and FCC problems might jeopardize the C–PACT cellular application since the Debtor owned 26% of C–PACT and Warlick controlled the Debtor. In fact at that time Heinz thought Warlick, not the

Debtor, owned 26% of C–PACT. They agreed that they needed to get Warlick out of the picture.

27. By March, 1984, Warlick was in default on his note to Viebeek for his purchase of Viebeek's stock in the Debtor. Viebeek did not exercise its pledge of 75% of the Debtor's stock or otherwise vote that stock until June, 1984. By June, 1984, increased foreign ownership or control of C–PACT was insignificant because of the effect of dilution by virtue of C–PACT's membership in its settlement group.

### Events Leading Up to Sale of Transferred C-PACT Stock

28. On 14 May 1984 Martin met with Warlick and purchased a paging license from the Debtor for $1,000. It was at this May 14th closing of the purchase of the paging license that Warlick first offered to sell the Transferred C–PACT Stock, and Martin testified that this was the first time that she had ever heard of "cellular" or C–PACT. According to Martin, Warlick described the value of C–PACT's cellular application, and therefore the value of the Transferred C–PACT Stock, as a lottery because as Warlick put it, "C–PACT had only a one-out-of-twenty-two chance of winning" the Charlotte-Gastonia non-wireline cellular license. On 15 May 1984 Martin had a forty (40) minute telephone conversation with Heinz during which Heinz testified that she asked and he answered many questions about cellular, settlements, the lottery, the wireline headstart and other unrelated matters and the value of cellular applications, and that he told her C–PACT's application could be worth $500,000, and her share $130,000. Martin testified that they only discussed his consenting under a C–PACT stockholder agreement to her purchase of the Transferred C–PACT Stock and other unrelated matters. On 14 May 1984 Martin telephoned Jim Wade ("Wade") of T.A. Associates to obtain his consent to the sale. As a condition to his consent, Wade wanted twenty of the 260 shares Ashley was purchasing, and Martin promised Wade that Ashley would sell those twenty shares to him at a "fair" price.

29. Heinz and Wade gave their consent to Ashley's purchase of the Transferred C–PACT Stock because of their desire to be certain that the Debtor's financial problems and the "Warlick" FCC problem did not jeopardize the C–PACT cellular application. Heinz still thought Warlick, not the Debtor, owned the Transferred C–PACT Stock. Heinz, who testified that he would have paid $50,000 for the Transferred C–PACT Stock, wanted to purchase the stock but could not reach Warlick. Jack Morris also wanted the Transferred C–PACT Stock, but feared that the personal animosity between Warlick and him would defeat his chances of purchasing the stock. Heinz was not aware that Ashley was paying only $5,000 for the Transferred C–PACT Stock.

30. Ashley paid the Debtor $5,000 on 17 May 1984 for the Transferred C–PACT Stock, although Martin says Warlick initially wanted $10,000. Then, in order to fulfill her obligation to Wade, Martin telephoned Wade on or about 24 May 1984 and offered to sell him for $10,000, twenty of the 260 shares she had just purchased on behalf of Ashley. Martin testified that Wade refused that offer and became angry with her, because he thought $10,000 was too high a price at that time for two (2%) percent of C–PACT's common stock.[5]

31. After the September, 1984, full market settlement in the Charlotte-Gastonia SMSA, Martin received offers concerning the sale of C–PACT's cellular application and passed them along to Heinz, conducted various telephone conferences with Heinz and others including potential purchasers of the C–PACT Stock and attended one C–PACT stockholder meeting in Charlotte. She had previously attended one meeting in Louisville with Heinz and Jack Morris. Ashley did not contribute to the increased value of the Transferred C–PACT Stock, and Ashley documented none of its costs during the post-transfer period. Throughout this period only Heinz and Jack Morris attended settlement meetings with other applicants. Heinz, Morris and Martin par-

ticipated in discussions of value and trading strategy on behalf of C–PACT. Jack Morris participated in these discussions of value and trading strategy because he had arranged to acquire part of Ashley's 26 percent interest in the C–PACT Stock, not as a representative of Debtor.

32. On 30 October, 1984, C–PACT's 1/22nd interest in the Charlotte-Gastonia SMSA cellular partnership because the key piece in a bidding war between the Providence Journal and Metro-Mobile CTS. Control of C–PACT would give the winner control of the Charlotte market. The Providence Journal was the successful bidder, offering $1,189,000. After selling its sole asset to the Providence Journal, C–PACT began the process of dissolution and liquidation under North Carolina law by filing articles of dissolution. C–PACT incurred costs and paid $89,000 in debts in this process of dissolution and liquidation. Thus, Ashley's share of the sale proceeds was $286,000, or 26% of $1,100,000, the net sale proceeds. Ashley never received its share. Instead, by means of a mandatory temporary restraining order and preliminary mandatory injunction of this Court, the funds were recovered by the Trustee directly from Heinz and C–PACT, and were held in escrow by the Trustee pending a final resolution of this adversary proceeding.

33. Heinz properly accounted for the $89,000 in liquidation expenses and other valid debts. Part of the $89,000 was paid to Heinz for certain fees, which the Court finds were reasonable. If it had not been for Heinz and his expertise, the Debtor would never have had any interest in a cellular application.

### DISCUSSION AND CONCLUSIONS OF LAW

This matter arises under title 11 (11 U.S.C. Sections 101 et seq.) and was properly called for trial before this Court on 3 June 1987, after notice to all parties, and this Court has jurisdiction over this adver-

---

5. Ten thousand dollars for twenty shares (or 2% of the outstanding common stock of C–PACT) equates to $130,000 for 260 shares. In other words, Ashley bought the 260 shares of stock for $5,000 and within about a week offered Wade twenty of those shares, or 8% of what Ashley had purchased, for $10,000, twice what Ashley had paid for all 260 shares. Martin testified that her offer to Wade was a "fair" price.

sary proceeding pursuant to 28 U.S.C. Section 157(b)(2) and 28 U.S.C. Section 1334(b).

### The Transfer is a Fraudulent Conveyance

■ Section 548(a)(2) of the Bankruptcy Code (the "Code") provides in relevant part:

(a) The Trustee may avoid any transfer of an interest of the debtor in property ... that was made ... on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily ...

(2)(A) received less than a reasonably equivalent value in exchange for such transfer ... and

(B)(i) was insolvent on the date that such transfer was made ... or became insolvent as a result of such transfer ...;

The Trustee bears the burden of proving that: (i) a transfer occurred; (ii) the transfer was a transfer of an interest of the Debtor in property; (iii) the transfer was made within one year of the filing of the Debtor's bankruptcy petition; (iv) the Debtor received less than reasonably equivalent value; and (v) the Debtor was insolvent or became insolvent as a result of the transfer. *Campbell v. Thames (In re Thames)*, 21 B.R. 704, 705 (Bankr.D.S.C.1981).

The Trustee and Ashley stipulated that (i) a transfer to Ashley of the Transferred C–PACT Stock occurred, (ii) the Transferred C–PACT Stock was property of the Debtor, (iii) the Transfer on 17 May 1984 was within one year of the filing of the Debtor's involuntary Chapter 7 bankruptcy petition on 10 May 1985 and (iv) the Debtor was insolvent at the time of the transfer. Thus, all elements of the Trustee's case, except the issue of reasonably equivalent value, were established at the outset of the trial.

A transfer that meets all of the initial requirements of Section 548(a) is a fraudulent transfer under Section 548(a)(2)(A) of the Code if the Debtor received less than a reasonably equivalent value. Although the Code does not define "reasonably equivalent value," the cases have generally used the "Durrett 70% test" as a beginning point for the analysis. In *Durrett v.*

*Washington National Insurance Co. (In re Durrett)*, 621 F.2d 201 (5th Cir.1980), the Court of Appeals held that a purchase price of 57.7% of the fair market value of the property transferred was not a fair equivalent under Section 67(d) of the Bankruptcy Act. The court noted that it had been unable to locate a fraudulent transfer case in which the court held that less than 70% of the fair market value of the property transferred was approved. *Id.* at 203. Many courts have adopted this 70% test in fraudulent transfer cases under Section 548(a)(2)(A) of the Code. *See e.g., Jacobson v. First State Bank of Benson (In re Jacobson)*, 48 B.R. 497 (Bankr.D.Minn. 1985).

The better reasoned cases eschew a strict percentage test and rely on an analysis of all the circumstances surrounding the suspect transfer to determine whether a fair economic exchange occurred. *See e.g., Cooper v. Smith, (In re Smith)* 24 B.R. 19 (Bankr.W.D.N.C.1982). In that case this Court stated that whether reasonably equivalent value was paid in a particular case depends upon the facts and circumstances of that case. As the Court stated:

Factors to be considered include the good faith of the transferee, the relative difference in the amount paid compared to the fair market value, and the percentage the amount paid is of the fair market value.

*Id.* at 23.

■ The word "value" in the phrase "reasonably equivalent value" means "fair market value," that is, what a willing purchaser with full knowledge would pay and what a willing seller with full knowledge would accept. *See e.g., Slutsky v. Michael Tire Co., (In re Vann)*, 26 B.R. 148 (Bankr. S.D.Ohio 1983). We have in this case a transfer which was between a willing purchaser (Martin acting on behalf of Ashley) and a willing seller (Warlick acting on behalf of the Debtor) at a price to which they agreed at arms length, but the evidence in this case clearly indicates to this Court that the parties were not well-informed and not knowledgeable, and therefore their conclusion as to value is not a fair determination of what reasonable market value was at

that point in time, to-wit, when the transfer on 17 May 1984 occurred.

■ After reviewing the more than two days of oral and documentary evidence in this case, including the testimony of four disinterested value witnesses, this Court concludes that the value of the Transferred C–PACT Stock at the time of the Transfer was at least $50,000. As a consequence, the Court finds that a payment of $5,000 was only 10% of, and was $45,000 less than, the fair market value of the Transferred C–PACT Stock. Even assuming good faith on the part of the transferee Ashley, the relative difference in the amount paid compared to fair market value is so great, and the percentage of the amount paid of the fair market value is so small, that this Court concludes that $5,000 was less than a reasonably equivalent value. Thus, the transfer of the Transferred C–PACT Stock to Ashley on 17 May 1984 was a fraudulent transfer under Section 548(a)(2) of the Code.

*The Transfer Should be Avoided and the Transferred C–PACT Stock Preserved for the Trustee Subject only to Certain Liens in Favor of Ashley*

■ This case is one of first impression before this Court, and as far as this Court can determine, a case of first impression under Section 548(a)(2). The fact that makes this case unique is the dramatic increase in value of the Transferred C–PACT Stock after the transfer, due largely to general market factors. The Trustee argues that the remedy should be the avoidance of the fraudulent transfer. This would give the post-transfer appreciation to the Trustee. Ashley argues that it should be allowed to retain the fraudulently transferred property if it pays the Trustee $45,000, the difference between the fair market value on the date of the transfer and the amount that Ashley actually paid. Based on the language of Sections 548(c) and 550(d) of the Code, this Court agrees with the Trustee.

Section 548(a) provides that a trustee in bankruptcy can avoid a fraudulent transfer of property of the debtor. Section 550(a) provides that the Court may order that the property transferred, or its value, be re-turned to the trustee. Section 550(a) does not state at what time this value is to be determined. Based on the language of Section 550(a), this Court finds a congressional intent to return the property transferred unless to do so would be inequitable. This approach avoids unnecessary contests over the meaning of the term "value," and thereby promotes judicial economy. In this case, there would be no inequity in ordering Ashley to return the Transferred C–PACT Stock to the Trustee, and the Court so orders.

The result in this case is also supported by Sections 548(c) and 550(d). Each of those sections provides that a good faith transferee of a fraudulent transfer is entitled to a lien on the property recovered by the trustee. The clear legislative intent of these sections is that the fraudulently transferred property and all proceeds and profits derived therefrom should be returned to the trustee subject only to certain specific liens in favor of a good faith transferee.

■ Section 548(c) provides that a good faith transferee is entitled to a lien in the amount of the consideration that he paid for the property. The Court concludes that the $5,000 purchase price of the Transferred C–PACT Stock resulted from a lack of full information rather than any bad faith. While there is other evidence of bad faith in the record, the Court holds that Ashley met its burden of showing that it was a good faith transferee. Thus, Ashley is entitled to a $5,000 lien on the Transferred C–PACT Stock.

Section 550(d) creates an additional lien for improvements made by a good faith transferee after the fraudulent transfer. The amount of that lien is the *lesser* of: (i) the costs of the improvements *less* any profits resulting from the property; and (ii) the increase in the value of the property resulting from the improvements. The negative implication of this detailed lien structure strictly limiting the recovery of a good faith transferee is that Sections 548(c) and 550(d) provide the only recovery available to a fraudulent transferee.

This reading of Sections 548 and 550 has been approved by other bankruptcy courts.

In *Nadel v. Fruitville Pike Associates (In re Burke)*, 60 B.R. 665 (Bankr.D.Conn. 1986), an involuntary Chapter 7 case, the Court, pursuant to Section 549(a) of the Code, avoided a transfer of certain real property by the debtor during the gap period between the filing of the petition and the entry of the order for relief. The transferee claimed that it was entitled, pursuant to Section 549(b) of the Code, to recover the value that it gave for the real property, an amount exceeding $87,000. The trustee claimed that the transferee's claim should be reduced by the $40,000 in rent that the transferee earned from the use of the property before it reconveyed it to the estate. In holding for the trustee on this issue, the court stated:

> Reading Section 549(b) with Section 550(d) demonstrates that Congress intended to provide a measure of protection to a good faith transferee of a debtor who conveyed property during the gap period by giving the transferee a lien on improvements plus any other allowed value given in exchange for the transfer. The idea was an attempt to return the transferee to the economic position he was in before the transfer, at least to the extent provided by those sections. Permitting the transferee to keep the net proceeds from the use of the property as well as the protection provided by the Code would give the transferee funds at the expense of the estate which could not have been intended by Congress. I accordingly conclude that the defendant's lien should be reduced by the $40,000 rental payments.

*Id.* at 670; *see also Rudin v. Steinbugler*, 103 F.2d 323 (2nd Cir.1939) (profits derived from fraudulently transferred property equitably belong to the debtor's creditors).

In this case, based on a limited record this Court concludes that Ashley incurred costs of $20,000 in connection with the Transferred C–PACT Stock after the Transfer. The Court further concludes that those costs were "improvements" within the meaning of Section 550(d) and that they increased the value of the Transferred C–PACT Stock by at least $20,000.

As a result of the foregoing, this Court concludes that Ashley should have a lien on the Transferred C–PACT Stock under Section 548(c) in the amount of the $5,000 value originally given, and also a lien under Section 550(d) for $20,000 for cost of improvements.

### Trustee's Claim Against Heinz Should be Dismissed

This Court has found as a fact that Heinz properly accounted for all C–PACT's disbursements of the $89,000 withheld from the distribution of the $1,189,000 C–PACT received from the Providence Journal. Therefore, the Trustee shall recover nothing from Heinz.

An appropriate judgment reflecting all the above shall be entered.